UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
CN and MN on behalf of EN,

                                        Plaintiffs,                    **OPINION & ORDER**

           - against -                                                  No. 19-CV-6793 (CS)

KATONAH LEWISBORO SCHOOL DISTRICT,

                                        Defendant.
--------------------------------------------------------------x

<u>Appearances</u>:

Peter D. Hoffman
Law Office of Peter D. Hoffman, PC
Katonah, New York
*Counsel for Plaintiffs*

David H. Strong
Steven L. Banks
Thomas, Drohan, Waxman, Petigrow & Mayle, LLP
Hopewell Junction, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

        Before the Court are the cross-motions for summary judgment of Plaintiffs CN and MN

(collectively, "Plaintiffs" or the "Parents"), (Doc. 20), and of Defendant Katonah Lewisboro

School District ("Defendant" or the "District"), (Doc. 26).  Plaintiffs bring this action on behalf

of their child, EN, pursuant to the Individuals with Disabilities Education Improvement Act, 20

U.S.C. §§ 1401 *et seq.*,[1] 34 C.F.R. §§ 300 *et seq.*, and Part 200 of the Regulations of the

Commissioner of the New York States Department of Education, 8 N.Y.C.R.R. §§ 200.1 *et seq.*

_____

        [1] The Individuals with Disabilities Education Act ("IDEA") was amended in 2004 by the
Individuals with Disabilities Education Improvement Act.  All references to and cases cited
herein discussing the IDEA remain authoritative.

(Doc. 4 ("Compl.") ¶¶ 2-3.)[2]  For the following reasons, Plaintiffs' motion is denied and

Defendant's motion is granted.

I.    **BACKGROUND**

A.  **Facts**

The following facts are based on the parties' Local Civil Rule 56.1 Statements, (Doc. 22

("Ps' 56.1 Stmt."); Doc. 29 ("D's 56.1 Stmt.")), their responsive 56.1 Statements, (Doc. 24 ("Ps'

56.1 Resp."); Doc. 30 ("D's 56.1 Resp.")), and the administrative record,[3] and are undisputed

unless otherwise noted.

EN attended school in the District from September 2003 through June 2011 (eighth

grade) and did not receive special educational services during that time.  (Ps' 56.1 Resp. ¶¶ 2, 3;

D's Ex. 1 at 1; D's Ex. 9 at 4.)  For her ninth-grade year (2011-2012), EN attended a private

school.  (D's Ex. 1 at 2.)  In December 2011, a private psychiatrist, Dr. Damore, diagnosed EN

as having Bipolar Disorder, Type II, and recommended that she be educated in a "therapeutic

supportive environment."  (Ps' 56.1 Resp. ¶ 4; D's Ex. 1 at 2.)

---

[2] In their memorandum, Plaintiffs make a passing reference to Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans and Disabilities Act, (Doc. 21 ("Ps' Mem.") at 3), but Plaintiffs did not plead a claim under either statute in their Complaint, (*see* Compl. ¶¶ 2, 4).  Even if they had, they have not shown the "bad faith or gross misjudgment" on the part of the District that would be required for such claims.  *See C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 840-41 (2d Cir. 2014).

[3] The Office of State Review has provided the Court with the administrative decisions and the certified record of the impartial hearings, including the hearing transcripts ("Tr."), exhibits, and post-hearing briefs.  The pages of the transcripts of the two hearings are numbered sequentially.  At the impartial hearing, exhibits offered by the District were identified by number, exhibits offered by the parents were identified by letter, and exhibits entered by the Impartial Hearing Officer ("IHO") were identified by Roman numeral.  For purposes of this decision, the Parents' exhibits will be denoted by "Ps' Ex."; the District's exhibits will be denoted by "D's Ex."; and exhibits entered by the IHO will be denoted by "IHO Ex."

### 1.   EN's IEP for the 2012-2013 School Year

On July 11, 2012, the District's Committee on Special Education ("CSE")[4] classified EN

as a student with a disability – specifically, as a student with an emotional disturbance – eligible

for special education services and accommodations.  (Ps' 56.1 Resp. ¶ 5; D's Ex. 1 at 1.)  The

CSE was responsible for working with CN and MN to develop an Individualized Education

Program ("IEP") that set forth EN's social, emotional, and educational needs and goals.  *See* 20

U.S.C. § 1414(d)(1)(A)-(B); 34 C.F.R. §§ 300.320-.321; N.Y. Educ. Law § 4402; 8 N.Y.C.R.R.

§§ 200.3, 200.4(d)(2).

During an August 28, 2012 meeting, the CSE discussed EN's program and placement for

her tenth-grade year and recommended, among other things, an 8:1+1 special class – consisting

of up to eight students, a special education teacher, and a teaching assistant – along with one

individual counseling session and one group counseling session each week.  (Ps' 56.1 Resp.

¶¶ 9-10; D's Ex. 2 at 1, 11.)  The CSE recommended EN's placement at the Therapeutic Support

Program ("TSP") operated by the Southern Westchester Board of Cooperative Educational

Services ("BOCES") and located at Irvington High School.  (Ps' 56.1 Resp. ¶ 6; D's Ex. 2 at 2.)

The TSP is a therapeutic day program intended for students with significant psychiatric issues,

(Ps' 56.1 Resp. ¶ 7; Tr. at 734:25-735:4, 7:35:14-20, 737:15-23), and it employs clinicians who

are available for crisis interventions, (Ps' 56.1 Resp. ¶ 8; Tr. at 735:20-25)  The CSE also

recommended strategies to address EN's history of non-compliance regarding getting up and

ready for school, including participation in the Before and After School Intervention Services

("BASIS") program, which would provide daily family support and strategies at home before

---

[4] A CSE includes, but is not limited to, parents, teachers, a school psychologist, and a
district representative.  N.Y. Educ. Law § 4402.

and after school, and the development of a functional behavioral assessment and a behavior intervention plan.  (D's Ex. 2 at 2, 11.)  Plaintiffs advised the CSE that Dr. Damore had told them that EN needed a residential placement, but the CSE responded that it was obligated to recommend the least restrictive environment ("LRE") suitable for the student's education.  (*Id.* at 2.)  Plaintiffs rejected the CSE's recommended placement as not being appropriate for EN because it was "not a residential therapeutic school with 24/7 coverage," and unilaterally placed EN at The Grove School ("Grove") for the 2012-2013 school year.  (Ps' 56.1 Resp. ¶¶ 11, 12; D's Ex. 3 at 1.)

### 2.      EN's IEP for the 2013-2014 School Year

On May 29, 2013, the CSE convened for an annual review and to develop EN's IEP for the 2013-2014 school year, which would be EN's eleventh-grade year.  (Ps' 56.1 Resp. ¶ 13; D's Ex. 3 at 1.)  The CSE noted concerns "within the areas of attitude to school, attitude to teachers, atypicality, locus of control, social stress, anxiety, depression, sense of inadequacy, somatization, attention problems, hyperactivity, relationship with parents, and self-esteem."  (Ps' 56.1 Resp. ¶ 16; D's Ex. 3 at 5.)  The CSE also noted a need for EN to "understand appropriate social behaviors and interactions with others, identify self-coping strategies, not engage in self-injurious behaviors and understand and accept the consequences for her actions."  (D's Ex. 3 at 5; *see* Ps' 56.1 Resp. ¶ 17.)

EN's IEP for 2013-2014, like her IEP for the 2012-2013 school year, recommended, among other things, instruction in an 8:1+1 special class and two counseling sessions per week.  (Ps' 56.1 Resp. ¶ 15; D's Ex. 3 at 1, 8-9.)  The CSE again recommended EN's placement at the BOCES TSP and her participation in the BASIS program, but Plaintiffs again rejected the

proposed placement and unilaterally placed EN at Grove for the 2013-2014 school year.  (Ps'

56.1 Resp. ¶ 18; D's Ex. 3 at 2, 9.)

### 3.    EN's IEP for the 2014-2015 School Year

On June 13, 2014, the CSE reconvened for an annual review and to develop EN's IEP for

the 2014-2015 school year, which would be EN's twelfth-grade year.  (Ps' 56.1 Resp. ¶ 20; D's

Ex. 4 at 1.)  EN's IEP for the 2014-2015 school year provided for instruction in an 8:1+1 special

class, related services of weekly individual and small group counseling, and other academic

accommodations.  (Ps' 56.1 Resp. ¶ 27; D's Ex. 4 at 1, 3, 10.)  The CSE again proposed EN's

placement at the BOCES TSP and participation in the BASIS program to address school and

homework avoidance issues.  (Ps' 56.1 Resp. ¶ 29; D's Ex. 4 at 2, 10.)

Before recommending EN's placement at the BOCES TSP, the CSE reviewed a letter

from EN's parents explaining why they felt that that placement was inappropriate for EN and

why Grove remained the proper school for their daughter.  (D's Ex. 4 at 2; *see* D's Ex. 21.)

They argued, among other things, that the TSP was not suited for a student with as many

complex issues as EN, that its motivational rewards system would not work with EN's

homework avoidance, that the presence of BASIS personnel in the home would increase EN's

anxiety, that before attending Grove EN would on occasion be violent, and that visits home from

Grove remained challenging.  (D's Ex. 21.)  The CSE also considered two March 2014 letters –

one from Dr. Chilton, a Grove psychiatrist, assessing EN's current psychiatric needs and another

from Nancy Darr, a licensed social worker at Grove, regarding EN's program there.  (Ps' 56.1

Resp. ¶¶ 21, 24; D's Ex. 4 at 2, 7.)  Dr. Chilton's letter provided that EN was "still at risk for

self-injurious behavior when stressed," but also noted that EN "has learned a lot about how to

prevent and manage dysregulated mood, and how to manage stressors in her life so as not to trigger bipolar exacerbations."  (D's Ex. 19; *see* Ps' 56.1 Resp. ¶¶ 22-23.)[5]

At the CSE meeting, a representative from BOCES explained that BASIS staff members are certified teachers or teaching assistants with training in therapeutic crisis intervention and are supervised by a school psychologist.  (Ps' 56.1 Resp. ¶¶ 30-31; D's Ex. 4 at 3.)  BASIS staff members were to work with EN and her family at their home before school to help EN establish routines to support getting her up and ready for school.  (Ps' 56.1 Resp. ¶ 33; D's Ex. 4 at 2.)  BASIS staff members would also work with EN and her family after school to provide "a structured setting to assist with homework production and to help [Plaintiffs] build skills to successfully interact with their child."  (Ps' 56.1 Resp. ¶ 33 (alteration in original); D's Ex. 4 at 2.)  EN's IEP also indicates that BOCES teachers "are available to students 24/7 electronically for check-ins and supports" and that "[t]here is also a motivational system in place, much like Grove School, to support compliance with academic performance."  (D's Ex. 4 at 3.)

At the CSE meeting, the Chair of the CSE asked Plaintiffs if they wanted EN to sit for the New York State Regents examinations, a prerequisite for conferral of a Regents diploma.  (Ps' 56.1 Resp. ¶ 35.)  Plaintiffs did not want EN to sit for the Regents examinations and stated that EN "will graduate with a private school diploma from Grove School in August 2015."  (Ps' 56.1

---

[5] Plaintiffs dispute this fact because it "does not tell the entirety of Dr. Chilton's opinion."  (Ps' 56.1 Resp. ¶ 22.)  But the excerpt is plainly accurate, (*see* D's Ex. 19), even if it is not a complete summary of Dr. Chilton's opinion.  Plaintiffs state that "Dr. Chilton stated that EN should continue at Grove," (Ps' 56.1 Resp. ¶ 22), but Dr. Chilton merely wrote, "I believe [EN] has not yet reached her full potential at Grove" and "I have tremendous faith that [EN] will thrive if given the opportunity to continue to engage in the hard work she does at Grove," (D's Ex. 19).  Ms. Darr, on the other hand, wrote that EN's psychological and academic needs made a therapeutic residential setting "crucial."  (D's Ex. 20.)  I am not convinced that Dr. Chilton's letter should necessarily be read as stating that "EN should continue at Grove," as Plaintiffs suggest, but regardless, it is not surprising that a Grove psychologist and a Grove social worker would recommend Grove.

Resp. ¶ 36 (alteration omitted); D's Ex. 4 at 2.)  Plaintiffs again unilaterally placed EN at Grove.

(Ps' 56.1 Resp. ¶ 38; *see* D's Ex. 21.)

### 4.    Dr. Dietrich's Report

In May 2014, Plaintiffs requested an Independent Educational Evaluation ("IEE") at the

District's expense in accordance with 8 N.Y.C.R.R. § 200.5(g).  (Ps' 56.1 Resp. ¶ 39; Ps' Ex. H;

Tr. at 1001-04.)[6]  Clinical psychologist Dr. Jeanne C. Dietrich conducted the psychological

evaluation and issued a report dated September 30, 2014 that she sent to the District, which

received it on October 21, 2014.  (Ps' 56.1 Resp. ¶¶ 40-41; D's Ex. 12 at 1; Tr. at 127:8-128:11.)

Dr. Dietrich diagnosed EN with Bipolar Disorder, Borderline Personality Disorder, Attention

Deficit Disorder, Reading Disorder, and Disorder of Written Expression, (Ps' 56.1 Resp. ¶ 42;

D's Ex. 12 at 27), and recommended, among other things, that EN attend a therapeutic

residential school, (D's Ex. 12 at 27-29).

Regarding the Borderline Personality Disorder diagnosis, Dr. Dietrich wrote, "[EN]

meets the diagnostic criteria for Borderline Personality Disorder which is a pervasive pattern of

instability of interpersonal relationships, self image and affects, and marked impulsivity

beginning by early adulthood and present in a variety of contexts."  (*Id.* at 26.)  Dr. Dietrich

added:

> [EN] displays a pattern of unstable and intense interpersonal relationships characterized
> by vacillations between idealization and devaluation, identity disturbance with markedly
> and persistently unstable sense of self, impulsivity in sex, reckless behavior, eating
> issues, recurrent suicidal behavior, gestures or threats or self-mutilating behavior,

---

[6] Section 200.5(g)(1) provides that "[i]f the parent disagrees with an evaluation obtained
by the school district, the parent has a right to obtain an independent educational evaluation at
public expense."  The record does not reveal that the District had obtained an evaluation with
which Plaintiffs disagreed.  Rather, it appears that the District accommodated Plaintiffs' request
that the District pay for an evaluation by a provider selected by Plaintiffs.  (Ps' Ex. H; Tr. at
129.)

affective instability due to a marked reactivity of mood, inappropriate intense anger, transient, stress-related paranoid ideation.

(*Id.*)

EN's Parents did not, and were under no obligation to, request that the CSE convene to consider Dr. Dietrich's report.  (Ps' 56.1 Resp. ¶ 46.)

### 5.    EN's IEP for the 2015-2016 School Year

On May 13, 2015 and June 11, 2015, the CSE convened to develop EN's IEP for the 2015-2016 school year.[7]  (Ps' 56.1 Resp. ¶ 48; D's Ex. 5 at 1; D's Ex. 6 at 1.)  At the May meeting, the CSE discussed EN's progress at Grove during the previous school year.  EN's academic advisor at Grove, Janet Lynch, stated that EN had "made a lot of progress throughout the 14/15 school year," reporting that EN had advanced in addressing her behavioral issues, having earned the privilege of walking into town and getting a job off campus, if she chose.  (Ps' 56.1 Resp. ¶ 49; D's Ex. 5 at 1.)  Dr. Dietrich participated in the CSE meeting by telephone and discussed her evaluation of the previous summer, the difficulty in testing EN because of her mood and emotional issues, and her diagnosis of a mood/personality disorder.  (D's Ex. 5 at 2; Tr. at 828:16-829:12.)  At the June meeting, a school psychologist from the BOCES TSP participated by telephone and described the individualized program available for EN should she enroll, and a BASIS representative explained that BASIS "helps students get to school in the morning and can provide assistance after school as well, including a parent counseling component."  (D's Ex. 6 at 1-3.)

---

[7] The review was necessary because EN – who had been approved for an extended school year (*i.e.*, year-round learning) the year before, (D's Ex. 4 at 1) – was not scheduled to graduate from Grove until August 16, 2015, which is after the 2015-2016 school year would have started, and she was entitled to programming until she graduated, (D's Ex. 5 at 1-2).

EN's IEP recommended extended school-year instruction in an 8:1+1 special class, related services of weekly individual and small group counseling, and other academic accommodations, including BASIS.  (Ps' 56.1 Resp. ¶¶ 51, 53; D's Ex. 5 at 1, 2, 9.)  The CSE again recommended EN's placement at the BOCES TSP for the 2015-2016 school year, but Plaintiffs rejected the placement and maintained EN's placement at Grove until she graduated on August 16, 2015.  (Ps' 56.1 Resp. ¶ 54; D's Ex. 5 at 2; D's Ex. 6 at 3.)

### 6.    EN's Placement at Grove

Grove is a private residential school in Connecticut.  (Ps' 56.1 Resp. ¶ 57.)  Grove's program requires students to meet with a psychologist for counseling twice a week, or more if the student is in crisis.  (Ps' 56.1 Resp. ¶ 61; Tr. at 1166:20-1167:5.)

From November 1, 2014 until January 13, 2015, EN's activities and interactions with staff were recorded in a log maintained by Grove staff assigned to EN's dormitory.  (D's Ex. 33; *see* Ps' 56.1 Resp. ¶ 58.)  During this period EN took trips off-campus, spent time socializing, studying or engaging in other school activities, and met with a Grove psychologist for counseling less than twice a week, missing several scheduled sessions.  (Ps' 56.1 Resp. ¶¶ 59, 61; *see* D's Ex. 33; Ps' Ex. EEE at 4-5.)  As of January 13, 2015, EN was relocated to a dormitory that did not maintain a log of her activities and staff interactions, (Ps' 56.1 Resp. ¶ 60; *see* D's Ex. 33), but between November 1, 2014 and August 16, 2015, there are no reports in the record of EN engaging in self-injury or seeking clinical interventions late at night.  (Ps' 56.1 Resp. ¶ 63; *see* D's Ex. 5 at 1-2; D's Ex. 33; Ps' Ex. EEE.)

Following her graduation from Grove, EN enrolled at the State University of New York Cobleskill campus.  (Ps' 56.1 Resp. ¶ 56.)

### B. Procedural History

#### 1. Due Process Complaint

By amended Due Process Complaint ("DPC") dated July 30, 2015, Plaintiffs challenged

the District's proposed placements for EN for the 2013-2014, 2014-2015, and 2015-2016 school

years, alleging that the District failed to offer EN a free appropriate public education ("FAPE")

for those school years.  (IHO Ex. I.)  Plaintiffs asserted that the BOCES TSP with BASIS was

not appropriate to address EN's special education needs because it was not a residential

therapeutic school like Grove.  (Ps' 56.1 Resp. ¶ 65; *see* IHO Ex. I at 14-15, 20-23, 25-28.)

Plaintiffs also argued that Grove was an appropriate placement for EN and that equitable

considerations supported their request for relief.  (IHO Ex. I at 25-31.)  Specifically, the Parents

requested an order directing the District to reimburse them for "tuition, including all associated

educational and clinical costs, room and board, and transportation for EN's attendance at The

Grove School for the 2013-2014 and 2014-2015 school years, as well as the summer of 2015,"

and for attorney's fees and costs.  (*Id.* Ex. I at 31.)[8]

#### 2. Impartial Hearing Officer Decision I

On October 14, 2015, the IHO commenced a hearing on the Parents' DPC, which

concluded on November 7, 2016 after nine nonconsecutive days of testimony.  (Decision of IHO

---

[8] Plaintiffs also requested an order granting Petitioners prevailing party status and finding
that (1) the District's 2013-2014 IEP was not appropriate as written; (3) the District's 2013-2014
IEP could not have been appropriately implemented by the District; (4) the District's 2014-2015
IEP was not appropriate as written; (5) the District's 2014-2015 IEP could not have been
appropriately implemented by the District, and was not appropriately applied insofar as no
Extended School Year was offered; (6) the District's 2015-2016 IEP was not appropriate as
written; (7) the District's 2015-2016 IEP could not have been appropriately applied by the
District; and (8) The Grove School is an appropriate placement for EN.  (IHO Ex. I at 31.)

Brad H. Rosken, dated June 29, 2017 ("IHO I")[9] at 2.)[10]  The District called three witnesses and submitted twenty-seven exhibits into evidence.  (*Id.*)  The Parents called four witnesses and submitted fifty-seven exhibits.  (*Id.*)  The IHO issued a decision on June 29, 2017, ruling in part for Plaintiffs.  (*Id.* at 32.)  The IHO found that the District offered EN a FAPE for the 2013-2014 school year[11] and the first portion of the 2014-15 school year, but failed to offer EN a FAPE for the portion of the 2014-2015 school year beginning November 1, 2014, and for the summer of 2015.  (*Id.* at 8.)  The IHO rested his determination that the District denied EN a FAPE for those periods on his findings that (1) the District was required to reconvene to consider Dr. Dietrich's report once it was received on October 21, 2014, (*id.* at 12-13, 15-17), and (2) in light of Dr. Dietrich's evaluation and testimony, the District failed to establish that the BOCES TSP with BASIS was an appropriate substitute for a residential therapeutic placement, (*id.* at 20-24).

First, the IHO determined that Dr. Dietrich's evaluation was a private evaluation, not an IEE,[12] and held, without citing authority, that the District "had an affirmative obligation to conduct a CSE to review and discuss the most recent and updated psychological evaluation for this student; especially since this latest evaluation stated that this student required a therapeutic

---

[9] Because there were initial decisions and remand decisions, the IHO Decisions will be referred to as IHO I or II and State Review Officer ("SRO") Decisions will be referred to as SRO I or II.

[10] The parties note that the impartial hearing was held on twelve separate hearing dates, (D's 56.1 Resp. ¶ 5), but in his decision, the IHO only lists eleven and notes that two were cancelled, (IHO I at 2).  In reviewing the record, I counted nine hearing transcripts.

[11] The IHO denied Plaintiff's request for tuition reimbursement for the 2013-2014 school year, (IHO I at 8), and Plaintiffs have elected not to seek judicial review of that decision.  (*See* Compl. ¶¶ 4, 10; D's 56.1 Resp. ¶ 8.)

[12] According to the IHO, the District should have refused the Parents' request for a District-paid evaluation by Dr. Dietrich, conducted an evaluation using a professional of its own choosing, and then, if the parents disagreed with the District's evaluation and requested an IEE, paid for Dr. Dietrich.  (IHO I at 13.)

residential placement." (*Id.* at 13-14.) He emphasized that the District received Dr. Dietrich's

report in October 2014 but did not meet until May 2015. (*Id.* at 17.)

Next, the IHO found that the "record is void of any explanation as to specifically how the

BASIS part of the recommended program would provide for the 24/7 support called for in Dr.

Dietrich's evaluation," (*id.* at 22):

> The parents knew and expressed concerns to the District at past CSE meetings that the
> proposed BOCES' TSP program did not provide for the round the clock supervision for
> this student and therefore would not be able to manage their behaviors outside of the
> school day, meaning that the student would not complete homework, suffer social
> isolation, engage in risky behaviors and make poor social and peer choices. Even with
> the proposed before and after school program, to wit: BASIS, there was not round the
> clock coverage as recommended by Dr. Dietrich,

(*id.* at 16). The IHO found Dr. Dietrich to be a compelling witness,[13] and did not find the same

to be true for the District's witnesses. (*Id.* at 17.)

The IHO also found that Plaintiffs had met their burden of showing that Grove was an

appropriate placement for EN. (*Id.* at 24-29.) He noted that the program at Grove was

"individually designed to meet the student's needs for therapeutic residential support." (*Id.* at

25.) He credited the testimony of Ms. Lynch, the Associate Director of Grove and EN's

academic advisor, and Ms. Darr, a clinician at Grove, who both testified as to the details of EN's

program and how it met EN's "specific and unique educational needs." (*Id.*) The IHO

commented that, "[m]ost importantly and especially appropriate for [EN] was the fact that there

is emotional support in the evenings so that [EN] can remain in school, a 24/7 supportive

environment." (*Id.* at 25-26.) The IHO also gave weight to Dr. Dietrich's testimony, including

---

[13] The IHO described Dr. Dietrich's testimony as "worthy of belief and form[ing] the
basis of my decision." (*Id.* at 20.) He noted, "While her testimony reads very well in a transcript
one needs to have actually seen it live to fully appreciate the effectiveness of it." (*Id.* at 22.) The
IHO also found Dr. Dietrich to be "very well credentialed," an "excellent witness," and an
"impressive and compelling witness for the parents' case," (*id.* at 20-22).

her comparison of testing from 2012 and 2014 which "found that [EN] made progress in nearly

every area, including but not limited to, areas of academic achievement and emotional lability."

(*Id.* at 27.)

Regarding equitable considerations, the IHO found that the Parents had been cooperative

and that "equities in this matter do favor a finding that Parents are entitled to tuition

reimbursement for the unilateral placement" of EN at Grove.  (*Id.* at 29.)  The IHO accordingly

granted the Parents' request for reimbursement for the period from November 1, 2014 through

August 2015 – "the time period from when the District received Dr. Dietrich's evaluation and

failed to act upon it."  (*Id.* at 30.)[14]

### 3.    The District's Appeal and the State Review Officer's Remand

The District appealed.  On appeal, the SRO vacated the tuition award and remanded the

case to the IHO for "factual development and a redetermination of the issue of whether the

BOCES TSP with BASIS setting was the student's LRE as a result of the district's receipt of the

September 2014 evaluation report in October 2014."  (Decision of SRO Justyn P. Bates, dated

October 2, 2017 ("SRO I") at 26-27.)  The SRO did not disturb the IHO's findings that Grove

was an appropriate placement for EN and that the parents had been cooperative.  (*Id.* at 25-27.)

The SRO found that the IHO had reached his decision based on procedural grounds

relating to the obligation to reconvene, without citing legal authority and without engaging in a

substantive analysis of whether the purported procedural violation denied EN a FAPE.  (*Id.* at

16.)  The SRO also indicated that, although Dr. Dietrich's report included a new diagnosis of

_____

[14] The District received Dr. Dietrich's evaluation on October 21, 2014.  (D's Ex. 12; IHO
I at 24.)  The IHO decided, without citing authority, that it "would be reasonable to give the
District about two (2) weeks from receipt to begin the process to convene a CSE meeting," and
that "therefore, the denial of FAPE for the 2014-2015 school year begins on November 1, 2014
and runs through the completion of that school year to June 26, 2015."  (IHO I at 24.)

Borderline Personality Disorder, "the description [in the report] of the student's actual emotional behaviors, symptoms and needs was similar to information reflected in the student's previous IEPs, especially the June 2014 IEP calling for a therapeutic day placement at BOCES TSP with BASIS" – which the IHO, in a finding not challenged by the Parents, found appropriate.  (*Id.* at 17.)

Regarding the purported procedural violation, the SRO explained that the IHO wrongly presumed that a CSE is required to reconvene upon a parent's submission of an IEE.  (*Id.* at 16.) After reviewing the relevant federal and state regulations, the SRO determined that the CSE was not required to reconvene when it received Dr. Dietrich's report because "district personnel did not recommend any change in [EN's] placement" and EN's "parents did not request to reconvene the CSE."  (*Id.*)

With respect to the FAPE inquiry, the SRO explained that the IHO "skipped the task of conducting a substantive LRE analysis."  (*Id.* at 18.)  Specifically, the IHO did not determine whether the BOCES TSP day program with BASIS support constituted EN's LRE, as opposed to the parents' preferred residential placement at Grove.  (*Id.*)  The SRO observed that Dr. Dietrich did "not seem to take into account at all the BASIS component of the school district's recommendation of the BOCES TSP," and that the parties had not developed the record on exactly what services BASIS would provide and how they differed from those at Grove.  (*Id.* at 17.)  The SRO also noted that the IHO's "conclusion that the CSE committed a procedural violation by failing to review the private evaluator's report does not apply to the May 2015 CSE," because the CSE did consider Dr. Dietrich's report in May 2015.  (*Id.* at 19.)  In remanding the case, the SRO directed the IHO and the parties to

> engage in the required fact development and analysis.  The IHO should require the parties to pay particular attention to how the private evaluator's safety concerns, as stated in her

> September 2014 evaluation report differed from the concerns that were before the June 2014 CSE and how they would or would not be addressed by the IEP proposal to place the student in the BOCES TSP with the BASIS placement in the time period following the district receipt of the evaluation report.

(*Id.* at 18.)  In other words, the SRO wanted the IHO to determine whether Dr. Dietrich's report contained any new substantive information about EN that compelled not only a reconvening, but also a recommendation for a change to EN's placement.  The SRO also instructed the parties and the IHO to consider EN's progress at Grove during the 2014-2015 school year "and whether the IDEA would require placement in a residential setting for the 2015-2016 school year or whether the district's less restrictive placement recommendation should be upheld."  (*Id.* at 19.)

### 4.    Impartial Hearing Officer Decision II

After receiving additional testimony from a BOCES social worker, Dr. Dietrich, and EN's mother, the IHO again concluded that the District denied EN a FAPE for both the portion of the 2014-2015 school year after November 1, 2014, as well as the summer portion of the 2015-2016 school year, and ordered the District to fund the costs of EN's tuition at Grove for those periods.  (Decision of IHO Brad H. Rosken, dated Dec. 18, 2018 ("IHO II") at 22-23.)

The IHO reiterated his view that Dr. Dietrich's report was not an IEE, but the District's evaluation, (*id.* at 9-10), and, based on this characterization, that "the District had an affirmative obligation to conduct a CSE to review and discuss the most recent and updated psychological evaluation," (*id.* at 11).  The IHO again concluded that this obligation arose within two weeks of receipt of the report.  (*Id.* at 22.)

As to the appropriateness of the District's recommendation of BOCES TSP with BASIS, the IHO found that the placement was inappropriate because BASIS services ended at 9:00 p.m. and EN required a 24/7 program.  (*Id.* at 13-14.)  The IHO emphasized that Dr. Dietrich's testimony both before and after remand was "worthy of belief" and formed the basis of his

decisions.  (*Id.* at 18.)  The IHO also opined that the SRO's remand order impermissibly shifted the burden of proof to the parents and Dr. Dietrich to show that BOCES TSP with BASIS support did not offer EN a FAPE in the LRE, as opposed to requiring the District to show the propriety of its offering.  (*Id.* at 13.)

The IHO determined that he could not rely on the testimony of BOCES social worker Rebecca Phang regarding the services provided by BASIS, because that testimony was "wholly retrospective."  (*Id.* at 16.)  The IHO explained that social worker, "had absolutely no personal knowledge of the subject student" and "had no knowledge whatsoever of the facts surrounding this matter."  (*Id.* at 14.)  The IHO added, "Most damaging was the fact that nothing she testified to at the remand hearing was ever discussed or explained to the parents at the subject June 2014 CSE meeting or at any time thereafter and therefore is completely retrospective testimony."  (*Id.*)

### 5.    State Review Officer Decision II

The District appealed, asserting that the IHO erred in finding that the District failed to offer EN a FAPE for the relevant portions of the 2014-2015 and 2015-2016 school years, and the SRO agreed.  (Decision of SRO Sarah L. Harrington, dated Mar. 27, 2019 ("SRO II") at 22-23.) The SRO found that the CSE did not have a legal obligation to convene after the District received a copy of Dr. Dietrich's report in October 2014, (*id.* at 11-12),[15] but even if it did, the

---

[15] In the previous appeal, the SRO determined that Dr. Dietrich's evaluation was an IEE, but that the distinction was not important, because even if it were considered to be a private evaluation, it would have to be considered in the same way as an IEE.  (SRO I at 16.)  He further found that under the applicable regulations, there was no set time frame in which such evaluations had to be considered, as long as no change in placement occurred before such consideration (and none had occurred here).  (*Id.*)  After remand, the IHO found that Dr. Dietrich's report was a district evaluation and that therefore the CSE had an obligation to reconvene.  (IHO II at 9-11; SRO II at 10.)  In the second appeal, the SRO found that the IHO erred in finding the report to be a district evaluation because the SRO did not leave this issue open for the IHO to revisit on remand.  (SRO II at 11 n.9.)  In the current case, Plaintiffs do not

CSE would not have been required to revise EN's IEP or change EN's placement for the 2014-2015 school year because the report did not provide any new substantive information that would have changed the initial recommendations, which the IHO had found appropriate, (*id.* at 14-15). She found that Dr. Dietrich had examined EN just weeks after the June 2014 CSE meeting, (*id.* at 12), and that the report "presented similar information about the student as known to the June 2014 CSE," (*id.* at 15). In other words, because the IHO's initial determination that the June 2014 IEP provided a FAPE had not been appealed and was "final and binding," and because the recommendations in that IEP "were based on similar information about [EN's] needs as set forth in [Dr. Dietrich's report]," (*id.* at 12), the failure to reconvene to consider the largely redundant information in the report did not deny EN a FAPE.

In reaching her decision, the SRO reviewed the same letters that the CSE considered at the June 2014 meeting. Ms. Darr's letter stated that EN exhibited "the most difficulty with her interpersonal relationships." (*Id.*; D's Ex. 20 at 2.) Dr. Chilton's indicated that EN had learned "a lot about how to prevent and manage dysregulated mood" and manage stressors "so as not to trigger bipolar exacerbations." (SRO II at 12; D's Ex. 19.) EN's Parents' letter noted that prior to attending Grove, EN threatened violence toward her parents, threatened self-injurious behavior, had thrown large objects at one of her parents while the parent was driving, and caused extensive damage to the furnishings and interior of their home. (SRO II at 12; D's Ex. 21 at 3.) The Parents' letter stated that home visits from Grove continue to present challenges: "She sometimes states that she does not want to visit here or live with us. She feels that she doesn't fit in and can't function. She feels like cutting herself. She continues to steal clothes, money,

---

challenge the SRO's determination that Dr. Dietrich's evaluation was an IEE. (Compl. at 5-7; Ps' 56.1 Stmt. at 4 n.5.)

jewelry, and other household items during home visits." (D's Ex. 21 at 3; *see* SRO II at 12.)
After reviewing these letters, the SRO determined that "[a]lthough the information available to
the June 2014 CSE did not specifically reference the student's more recent episode of self-
injurious behavior [while home from Grove on winter break], the hearing record shows that the
district was aware that the student had engaged in that behavior in the past." (SRO II at 13
(citing D's Ex. 1 at 2, 7; D's Ex. 2 at 8; D's Ex. 3 at 5; D's Ex. 21 at 3)). The SRO also
determined that "the hearing record shows that the District had been aware of the student's risk
for suicidal ideation since May 2012." (SRO II at 13; *see* D's Ex. 9 at 3.)

Next, the SRO focused on Dr. Dietrich's new diagnosis of Borderline Personality
Disorder. (SRO II at 13-14.) The SRO explained that "even though the private psychologist
offered a new diagnosis of [EN], federal and State regulations do not require a District to focus
on a student's diagnoses when developing an IEP; instead, they require the District to 'gather
[relevant] functional, developmental, and academic information' to assist in . . . developing an
IEP." (*Id.* at 14 (quoting 34 C.F.R. § 300.304(b)(1) and 8 N.Y.C.R.R. § 200.4(b)(1)).) The SRO
concluded that the behaviors described in Dr. Dietrich's report as underlying the diagnosis
(summarized in Section I.A.4, above) were previously known to the CSE. (*Id.* at 14 (citing D's
Ex. 12 at 26; Ps' Ex. D; D's Ex. 1 at 2, 7; D's Ex. 2 at 2-4, 7-8; D's Ex. 3 at 5-6; D's Ex. 4 at 2,
4, 7; D's Ex. 9; D's Ex. 11 at 2; D's Exs. 19-21).)

The SRO also considered the rationale for Dr. Dietrich's recommendation that EN attend
a therapeutic residential program. (*Id.*) Again, the SRO found that the "concerns regarding
[EN's] self-injurious behaviors when stressed, problematic interpersonal relationships, as well as
psychological and academic needs . . . was information already known to the CSE." (*Id.*) The
SRO ultimately concluded that because EN's needs "remained constant subsequent to the June

2014 CSE meeting, . . . it would not appear that the district's receipt of [Dr. Dietrich's report] should have alerted the CSE that the student needed a residential placement any more than the other documents recommending residential placement considered by the June 2014 CSE."  (*Id.* at 19.)

The SRO proceeded to review relevant legal authority related to a LRE analysis, noting that the Second Circuit has required objective evidence that a student cannot obtain an educational benefit in a less restrictive setting before finding that a residential placement is required by the IDEA.  (*Id.* at 15-16.)[16]

The SRO then reviewed social worker Phang's testimony and found that it did not constitute after-the-fact testimony.  The SRO noted that such testimony was not being used to "'rehabilitate a deficient IEP,'" as the IHO had suggested, but rather that it merely "'explains or justifies the services listed in [EN's] IEP' and, thus, may be considered."  (*Id.* at 17 (quoting *R.E. ex rel. J.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 186 (2d Cir. 2012).)[17]  In reaching this determination, the SRO referenced the June 2014 IEP – which identified the BASIS program as being part of EN's recommended services – and the meeting information summary describing some of the program's features.  (*Id.*)  The SRO summarized Ms. Phang's testimony, specifically noting that the testimony "reflects that BASIS could be available as early in the morning as

---

[16] *See M.H. v. Monroe-Woodbury Cent. Sch. Dist.*, 296 Fed. App'x 126, 128 (2d Cir. 2008) (summary order) ("In general, the Second Circuit requires that a court point to objective evidence of a child's regression in a day-program before finding that a residential placement is required by the IDEA"); *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 131-32 (2d Cir. 1998) ("Cases from other circuits point to similar objective evidence of a child's regression in a day program before finding a residential placement to be required by IDEA").

[17] While the SRO noted that Ms. Phang's testimony generally explained BASIS "in a manner consistent with the IEP," she added that "[t]o the extent the social worker's testimony went beyond the bounds of explaining BASIS as listed in the IEP, it has not been relied upon." (SRO II at 17.)

needed to get a student to school, until approximately 9:00 pm and on weekends, but that the

BASIS program was not considered 24-hour support." (*Id.* at 16-17.) The SRO noted that "the

BASIS program served students – some of whom had also received diagnoses of bipolar and

personality disorders – who exhibited behaviors similar to [EN] including school avoidant, self-

injurious, violent and threatening behaviors and who engaged in inappropriate interpersonal

relationships and displayed poor hygiene." (*Id.* at 17.)

Regarding the 2015-2016 school year, the SRO found that the IHO had not separately

examined the recommendations of the May/June 2015 CSEs separately from the June 2014 CSE

as instructed. (*Id.* at 19.) The SRO proceeded to conduct her own independent review and found

that "the information available to the May and June 2015 CSEs, including [Dr. Dietrich's report]

and the information from Grove, reflected that [EN] had made social/emotional, behavioral, and

academic progress during the 2014-2015 school year, such that a more restrictive placement

recommendation for the 2015-2016 school year was not warranted." (*Id.* at 22.) The SRO felt

that this case was not an easy one, but reversed the IHO's decision finding that the District failed

to offer EN a FAPE and directing the District to fund the costs of EN's attendance at Grove. (*Id.*

at 22-23.)

### 6.    The Instant Action

Plaintiffs filed their Complaint on July 23, 2019, seeking an order (1) affirming the IHO's

decision to award tuition reimbursement, (2) reversing the SRO's decision insofar as it denied

the Parents' request for tuition reimbursement for portions of the 2014-2015 and 2015-2016

school years, and (3) directing the District to reimburse Plaintiffs. (Compl. at 10-11.) Plaintiffs

explain that "[t]his dispute largely surrounds the parents' belief that EN required a residential

therapeutic placement and the district did not believe that EN required a residential therapeutic placement."  (*Id.* ¶ 38.)

## II.   LEGAL STANDARDS

### A.   Summary Judgment Standard for IDEA

Motions for summary judgment customarily resolve IDEA actions in federal court.  *See Antonaccio ex rel. Alex v. Bd. of Educ.*, 281 F. Supp. 2d 710, 714 (S.D.N.Y. 2003).  Under the IDEA, unlike in the usual case, the existence of a disputed issue of fact will not defeat the motion.  *Id.*  Rather, summary judgment "is a pragmatic procedural mechanism for reviewing administrative decisions."  *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (internal quotation marks omitted).  In reviewing an action pursuant to 20 U.S.C. § 1415(i), the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C); *see P.C. v. Rye City Sch. Dist.*, 232 F. Supp. 3d 394, 406 (S.D.N.Y. 2017).

The court's review "requires a more critical appraisal of the agency determination than clear-error review but falls well short of complete *de novo* review."  *L.O. ex rel. K.T. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 108 (2d Cir. 2016) (internal quotation marks omitted).  The district court must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence, but its review of state administrative decisions is limited.  *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 205-06 (1982); *M.H. ex rel. P.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012); *Walczak*, 142 F.3d at 129.  "While federal courts do not simply rubber stamp administrative decisions, they are expected to give due

weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Walczak*, 142 F.3d at 129 (alteration and internal quotation marks omitted); *see M.H.*, 685 F.3d at 240.

In many instances, "the district court's analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court," but the determination "must also be colored by an acute awareness of institutional competence and role." *M.H.*, 685 F.3d at 244. Deference to administrative decisions is particularly warranted where the district court's review "is based entirely on the same evidence as that before the SRO," *id.*, and where the IHO and SRO decisions are in agreement, *C.W. ex rel. W.W. v. City Sch. Dist. of N.Y.*, 171 F. Supp. 3d 126, 131-32 (S.D.N.Y. 2016). Where the IHO and SRO decisions conflict, the IHO's "may be afforded diminished weight," as the Court "defer[s] to the final decision of the state authorities" – that is, the SRO's decision. *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009) (internal quotation marks omitted). Reviewing courts should also be mindful that they are not to "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. Accordingly, "a court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned," *R.E.*, 694 F.3d at 189, particularly with respect to "determinations regarding the substantive adequacy of an IEP," *M.H.*, 685 F.3d at 244. In short, deference to "the application of expertise and the exercise of judgment by school authorities" is

appropriate where they "offer a cogent and responsive explanation for their decisions." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001-02 (2017).

### B.   Provision of a FAPE and Unilateral Placement in Private Schools

"The IDEA requires States receiving federal funds to provide 'all children with disabilities' with a FAPE," which includes "'special education and related services' tailored to meet the unique needs of a particular child." *Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 741 (2d Cir.) (first quoting 20 U.S.C. § 1412(a)(1)(A); then quoting *id.* § 1401(9)).  Related services include "transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education."  20 U.S.C. § 1401(26)(A).

"The IEP is 'the centerpiece of the [IDEA's] education delivery system for disabled children.'" *Mr. P*, 885 F.3d at 741 (alteration in original) (quoting *Endrew F.*, 137 S. Ct. at 994). The IEP must be developed annually by "[a] school official qualified in special education, the child's teacher, the child's parents, and, where appropriate, the child." *Walczak*, 142 F.3d at 122. "A school district meets its obligations to provide a FAPE by creating an IEP that is developed in compliance with the IDEA's procedural and substantive requirements." *N.B. v. N.Y.C. Dep't of Educ.*, 711 F. App'x 29, 32 (2d Cir. 2017) (summary order).  In the Second Circuit, review of the adequacy of an IEP proceeds in two steps:  (1) whether "the District has complied with the IDEA's procedural requirements" and (2) whether, substantively, the IEP is "'reasonably calculated to enable the child to make progress appropriate in light of the child's circumstances.'" *Mr. P*, 885 F.3d at 748 (alteration omitted) (quoting *Endrew F.*, 137 S. Ct. at 1001).  "As to this latter requirement, the IEP need not bring the child to grade-level achievement, but it must aspire to provide more than *de minimis* educational progress." *N.B.*,

711 F. App'x at 32.  "What the statute guarantees is an appropriate education, not one that

provides everything that might be thought desirable by loving parents."  *Walczak*, 142 F.3d at

132 (internal quotation marks omitted).

"In addition to providing an education that is likely to produce progress and tailored to

the unique needs of the child, the program must be offered in the least restrictive environment."

*Avaras ex rel. A.A. v. Clarkstown Cent. Sch. Dist.*, No. 18-CV-6964, 2019 WL 4600870, at *2

(S.D.N.Y. Sept. 21, 2019) (citing 20 U.S.C. § 1412(a)(5)(A)).  "[A] disabled student's least

restrictive environment refers to the least restrictive educational setting consistent with that

student's needs, not the least restrictive setting that the school district chooses to make

available."  *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 163 (2d Cir. 2014).

"This requirement expresses a strong preference for children with disabilities to be educated, to

the maximum extent appropriate, together with their non-disabled peers."  *Id.* at 161 (internal

quotation marks omitted).

"New York's regulations implementing the goals of the IDEA 'appear to track the IDEA

closely.'"  *P.C.*, 232 F. Supp. 3d at 408 (quoting *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 363 (2d

Cir. 2006)); *see* N.Y. Educ. Law §§ 4401 to 4410-b.  Parents are entitled to challenge "any

matter relating to the identification, evaluation or educational placement of the student or the

provision of a free appropriate public education to the student."  N.Y. Educ. Law § 4404(1); *see*

*also* 20 U.S.C. § 1415(b)(6)(A) (same).  Such challenges must be heard at an impartial due

process hearing conducted by the state or local education agency, *see* 20 U.S.C. § 1415(f), and

either party may appeal an adverse decision to the appropriate state agency, *see id.* § 1415(g);

N.Y. Educ. Law § 4404(2).  Once this administrative process is exhausted, a party may file a

civil action in federal or state court challenging the administrative decision.  *See* 20 U.S.C.

§ 1415(i)(2)(A); N.Y. Educ. Law § 4404(3).

      "If a state receiving IDEA funding fails to give a disabled child a FAPE . . . , the child's

parent may remove the child to an appropriate private school and then seek retroactive tuition

reimbursement from the state."  *Bd. of Educ. v. O'Shea*, 353 F. Supp. 2d 449, 454 (S.D.N.Y.

2005) (internal quotation marks omitted).  Parents who seek such reimbursement must satisfy the

three-pronged "*Burlington/Carter*" test, which looks to (1) whether the school district's proposed

program will provide a FAPE; (2) whether the parents' private placement is appropriate; and

(3) a consideration of the equities.  *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 73 (2d

Cir. 2014).  *See generally Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993); *Sch.*

*Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985).  To satisfy the first prong, the

school district bears the burden of proving that it timely provided a FAPE to the student.  N.Y.

Educ. Law § 4404(1)(c); *see T.K. ex rel. L.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d 869, 875 (2d

Cir. 2016) ("Under New York law, the Department [of Education] bears the burden of

establishing the validity of the IEP . . . .") (internal quotation marks omitted).  To satisfy the

second prong, the parent bears the burden of demonstrating that the unilateral private placement

was appropriate.  *See, e.g.*, *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir.

2007).  Whether a parental placement is appropriate turns on "whether a placement – public or

private – is reasonably calculated to enable the child to receive educational benefits."  *Frank G.*,

459 F.3d at 364 (internal quotation marks omitted).

## III.   **DISCUSSION**

      Plaintiffs argue that the IEPs developed for EN for the 2014-2015 and 2015-2016 school

years were not appropriate and did not offer her a FAPE.  (Ps' Mem. at 3.)  Specifically,

Plaintiffs assert that the BOCES/BASIS program was no longer appropriate for EN after the District received Dr. Dietrich's report in October 2014, and that the SRO's decision to the contrary must be reversed.  (*Id.* at 8.)  Defendant argues that the SRO correctly found that the relevant IEPs provided EN a FAPE in, as required, the LRE.  (Doc. 27 ("D's Mem.") at 12-18.)

The SRO's review of the record was thorough – she considered the evidence submitted by the parties as well as the IHO's reasoning – and she set forth her decision in a well-reasoned, detailed opinion.  The SRO's decision deserves deference from this Court, *see M.H.*, 685 F.3d at 244 ("[T]he district court should afford more deference [to the SRO's decision] when its review is based entirely on the same evidence as that before the SRO . . . ."); *P.C.*, 232 F. Supp. 3d at 410 (well-reasoned, detailed opinion entitled to deference), and the preponderance of the evidence, *see* 20 U.S.C. § 1415(i)(2)(C)(iii), supports her conclusions, for the reasons discussed below.

### A.     Dr. Dietrich's Report Did Not Require <br> the CSE to Reconvene in October 2014

First, Plaintiffs argue that the District committed a procedural violation of the IDEA because Dr. Dietrich's report required the CSE to reconvene in October 2014.  Plaintiffs explain that the SRO "wrongfully concluded that there is no time limit as to when a report should be reviewed" and that "the law did not envision an acceptable time limit of eight moths to pass before an expert report would be reviewed, especially a report with a new diagnosis of Borderline Personality Disorder."  (Ps' Mem. at 9.)  But in support, Plaintiffs merely cite a portion of the SRO's decision reviewing the relevant regulations – none of which (as the SRO correctly found)

set a time limit as to when a report should be reviewed.  (*Id.* at 8.)[18]  The IDEA simply requires

the CSE to "review[] the child's IEP periodically, but not less frequently than annually, to

determine whether the annual goals for the child are being achieved," and to "revise[] the IEP as

appropriate to address" any lack of expected progress, the result of any reevaluation, new

information from the parents, or other matters.  20 U.S.C. § 1414(d)(4)(A).  Thus, there is a

statutory mandate to revisit the IEP annually, but there is no requirement that the CSE reconvene

whenever additional information comes to its attention.[19]  I find that the District satisfied any

obligation it had to review Dr. Dietrich's report when it considered the report at its annual review

in May 2015.  (*See* D's Ex. 5 at 2-3.)

---

[18] The SRO surveyed the IDEA, 20 U.S.C. § 1414(d)(4)(A), as well as state and federal
regulations and guidance from the United States Department of Education's Office of Special
Education Programs.  (*See* SRO II at 11.)  The SRO concluded that there is no authority
requiring "a district to convene a CSE within a specified period of time upon completion or
receipt of an evaluation, whether that evaluation be a district evaluation, a private evaluation, or
an IEE."  (*Id.*)  In their reply memorandum, Plaintiffs cite to a New York State regulation
concerning IEEs, but the cited regulation does not set a time period in which a school district
must reconvene to consider an IEE.  (Doc. 23 ("Ps' Reply") at 13.)  It merely states that the
results of an IEE "must be considered by the school district, if it meets the school district's
criteria, in any decisions made with respect to the provision of a free appropriate public
education for the student."  8 N.Y.C.R.R. § 200.5(g)(vi).  Here Dr. Dietrich's report was
considered when a decision regarding EN was next made in May 2015.  Plaintiffs also point to a
state regulation that directs that when a parent requests an IEE, the school district must respond
to that request "without 'unnecessary delay.'"  (Ps' Reply at 13 (quoting 8 N.Y.C.R.R.
§ 200.5(g)(iv).)  It says nothing about when or whether a reconvening of the CSE is required
upon receipt of an IEE.

[19] If I were to assume that the directive that the IEP be "revise[d] . . . as appropriate"
requires such revision outside of the annual CSE meeting – an assumption not supported by the
statutory language – whether such revision is necessary in a given case turns on whether the new
information would prompt any substantive change in the IEP.  In that sense, then, the issue
whether revision is appropriate would coalesce with the question whether the additional
information added anything new that would change the CSE's analysis.  As discussed in the next
section, in EN's case it did not.

**B.**   **Dr. Dietrich's Report Did Not Require the CSE to Revise EN's IEP**

Even if the CSE had a legal obligation to convene in October 2014 after receiving Dr.
Dietrich's report, such a procedural violation would not warrant tuition reimbursement because
the report did not contain any new substantive information that would have required the CSE to
revise EN's IEP and change EN's placement.  *See M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*,
725 F.3d 131, 139 (2d Cir. 2013) ("[P]arents must articulate how a procedural violation resulted
in the IEP's substantive inadequacy or affected the decision-making process.").

One such indication is the undisputed fact that the Parents never requested a meeting with
the CSE after the issuance of the report.[20]  While they were under no obligation to do so, these
educated, involved, represented parents who had forcefully advocated for a residential placement
apparently did not at the time regard the report as the bombshell they now argue required
immediate action by the District.  Additionally, Grove took no meaningful action when it
received Dr. Dietrich's report in June 2015.  As the District notes, "Grove neither modified EN's
program in response to Dr. Dietrich's report nor added the new diagnosis to EN's discharge
diagnoses."  (D's Mem. at 14 (citing Tr. at 888:22-889:9, 1377:5-1378:10).)

Most fundamentally, when the CSE convened to develop EN's placement for the 2014-
2015 school year, it considered "EN's history of self-injurious behaviors; bipolar disorder and

---

[20] EN's Parents were not obligated to request a meeting with the CSE, but had they
requested one, the analysis would be different.  *See* Assistance to States for the Education of
Children with Disabilities and the Early Intervention Program for Infants and Toddlers with
Disabilities, 64 Fed. Reg. 12476-77 (Mar. 12, 1999) (if parent requests IEP meeting and school
district refuses, district must provide written notice to parents of the refusal, including
explanation of why it determined that meeting not necessary); 34 C.F.R. § 300.503(a)(2) (district
must provide written explanation if it refuses to change child's placement); 8 N.Y.C.R.R.
§ 200.5(a) (same); *Katonah-Lewisboro School District Special Education District Plan* 30
(2016) (describing the relevant regulations in layperson's terms), https://www.klschools.org/
groups/4500/special_services/home (click "April 2016 Special Education Plan Final.pdf" under
"Welcome to Special Services").

personality issues; difficulties managing relationships; threats to her family members; and issues

with homework production," (D's Mem. at 13-14) – the same history on which Dr. Dietrich

relied in diagnosing EN with Borderline Personality Disorder.[21]  And the behaviors described in

the report – "impulsivity in sex, reckless behavior, eating issues, recurrent suicidal behavior,

gestures or threats or self-mutilating behavior, affective instability . . . , inappropriate intense

anger, [and] transient, stress-related paranoid ideation," (D's Ex. 12 at 26) – were previously

known to the CSE, (D's Ex. 1 at 2; D's Ex. 2 at 3; D's Ex. 3 at 5; D's Ex. 4 at 2-3, 7; D's Ex. 9;

D's Ex. 19; D's Ex. 20; D's Ex. 21).[22]  The SRO undertook a careful comparison of EN's issues

_____

[21] Dr. Dietrich's testimony suggests that her diagnosis was not based on any reports of self-injurious behaviors or suicidal gestures after the June 2014 CSE meeting – indeed, her last meeting with EN was on July 2, 2014 – but, rather, on EN's behavioral history.  (*See* Tr. at 1623:8-1624:10, 1627:16-1628:19; D's Ex. 12.)

[22] Notes from the CSE's initial eligibility determination meeting in July 2012 confirm that the CSE knew that EN had been diagnosed with Bipolar Disorder Type 2, and that she "refused to attend school, attend to daily hygiene, was argumentative, combative with family, engaging in risky behaviors and was suspended mid-year for an alcohol related incident."  (D's Ex. 1 at 2.)  In developing EN's IEP for the 2012-2013 school year, the CSE heard from Dr. Damore, who reported, among other things, that EN was "experiencing a significant amount of mood lability and irritability that manifest in temper tantrums . . . ."  (*Id.*)  Dr. Damore also informed the CSE that EN "is interpersonally volatile."  (*Id.*)  EN's IEP for the 2012-2013 school year reflects the CSE's understanding that EN had "been engaging in sexually provocative communications with older boys" and that EN's parents were concerned with EN's "experimentation with alcohol, self-mutilation and poor social boundaries."  (D's Ex. 2 at 3.)  While developing EN's IEP for the 2013-2014 school year, the CSE noted concerns "within the areas of attitude to school, attitude to teachers, atypicality, locus of control, social stress, anxiety, depression, sense of adequacy, somatization, attention problems, hyperactivity, relationship with parents, and self-esteem."  (D's Ex. 3 at 5.)  The CSE also noted a need for EN to "understand appropriate social behaviors and interactions with others, identify self-coping strategies, not engage in self-injurious behaviors and understand and accept the consequences for her actions."  (*Id.*)  EN's IEP for the 2014-2015 school year confirms that the CSE had been aware that EN "still struggle[d] with interpersonal relationships with others."  (D's Ex. 4 at 2.)  At the June 2014 CSE meeting, the CSE reviewed a letter from EN's parents, (D's Ex. 21), and letters from Ms. Darr and Dr. Chilton, (D's Exs. 19, 20).  (D's Ex. 4 at 2.)  The letters described EN's self-injurious behaviors, her difficulty sustaining healthy boundaries with peers and adults, and her emotional and social struggles.  (*See* D's Exs. 19, 20, 21.)

as described in Dr. Dietrich's report, and correctly concluded that the CSE was aware of them. (*See* SRO II at 14.)  Based on my own review of the record, I agree with the SRO that the CSE knew of EN's "significant difficulty with interpersonal relationships, sexualized and inappropriate behaviors, recurrent self-harm and suicidal ideation, intense anger and mood swings, and family relationships" when it met in June 2014.  (*See id.* (citing D's Ex. 12 at 26; Ps' Ex. D; D's Ex. 1 at 2, 7; D's Ex. 2 at 2-4, 7-8; D's Ex. 3 at 5-6; D's Ex. 4 at 2, 4, 7; D's Ex. 9; D's Ex. 11 at 2; D's Exs. 19-21).)  As the substantive propriety of the June 2014 IEP is unchallenged, a new report providing essentially the same underlying behavioral information did not require revision of that IEP.

Additionally, EN's new diagnosis did not require revision of the IEP.  Federal and state regulations do not require a district to focus on diagnoses when developing an IEP; rather, they require the district to "gather relevant functional, developmental and academic information . . . that may assist in determining whether the student is a student with a disability and the content of the student's individualized education program."  8 N.Y.C.R.R. § 200.4(b)(1); *accord* 34 C.F.R. § 300.304(b)(1).  "[T]he IDEA mandates services tailored to a child's individual needs, not dictated by a particular diagnosis or classification."  *K.H. v. N.Y.C. Dep't of Educ.*, No. 12-CV-1680, 2014 WL 3866430, at *19 (E.D.N.Y. Aug. 6, 2014).

Plaintiffs argue that Dr. Dietrich did not think the BOCES/BASIS program was appropriate because it did not provide 24/7 coverage.  (Ps' Mem. at 9).  But as the SRO noted, Dr. Dietrich's rationale for recommending such coverage, was substantively the same as the rationale provided to the CSE by Dr. Damore in July 2012, and Dr. Chilton and Ms. Darr in March 2014 –

concerns regarding EN's self-injurious behaviors,[23] problematic interpersonal relationships, and psychological and academic needs.  (*See* SRO II at 14.  *Compare* D's Ex. 12 at 26-27, *with* D's Exs. 19, 20, *and* Ps' Ex. D.)  Plaintiffs themselves point out that "[b]y the time of Dr. Dietrich's report in October 2014, the CSE had already heard the same from Dr. Damore, Dr. Chilton, Ms. Darr, and the parents that the appropriate placement for EN was a residential therapeutic placement for EN at Grove."  (Ps' Reply at 14 n.9 (citations omitted).)  In these circumstances the SRO correctly concluded that the addition of one more parent-selected professional's opinion would not have made a difference in the CSE's evaluation.

In short, substantial evidence supports the SRO's determination that the information in Dr. Dietrich's report was sufficiently similar to the information already before the CSE and that a revision of the IEP would not have been necessary even if the CSE were under an obligation to meet to consider that report.  (*See* SRO II at 15.)  The SRO's reasoning that nothing in Dr. Dietrich's report undermined the CSE's earlier conclusion was thorough and thoughtful and deserves deference.  Whether the addition of a diagnosis, or another recommendation of a residential placement, requires revision of an appropriate placement is a question of educational expertise that this Court, under applicable standards, ought not to second guess.  *See J.P. ex rel. J.P v. City of N.Y. Dep't of Educ.*, 717 F. App'x 30, 32 (2d Cir. 2017) (summary order) (well-reasoned and supported administrative decisions deserve deference).

---

[23] Plaintiffs explain that Dr. Dietrich believed EN required "24/7 coverage" because of two incidents during the 2013-2014 school year.  (Ps' Reply at 3.)  The first incident was an episode of self-cutting during winter break of the 2013-2014 school year and the second was EN's refusal to leave her mother's car because "she felt she did not look good after a haircut." (*Id.*)  Without minimizing the seriousness of EN's self-cutting incident, it is the kind of self-injurious behavior of which, as previously discussed, the CSE was already aware.  The second incident, while surely upsetting and frustrating for the Parents, does not amount to self-injurious behavior supporting a need for 24/7 monitoring.

## C.     The Placements Offered by the District for the 2014-2015 and 2015-2016 School Years Were Appropriate

Plaintiffs argue that a therapeutic day program and participation in BASIS was not an appropriate placement for EN because it did not provide 24/7 coverage.  (Ps' 56.1 Resp ¶¶ 8-11, 14-15, 18, 27, 29, 53; Ps' Mem. at 9; Ps' Reply at 2 n.3, 3, 15.)  But while Plaintiffs note that every examiner who saw EN concluded that she needed a therapeutic boarding school, (Ps' Mem. at 9), the "mere fact that a separately hired expert has recommended different programming does nothing to change the deference [owed] to the district and its trained educators."  *E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.*, 742 F. Supp. 2d 417, 436 (S.D.N.Y. 2010) (internal quotation marks and alterations omitted), *aff'd*, 487 F. App'x 619 (2d Cir. 2012) (summary order); *see M.N. v. Katonah Lewisboro Union Free Sch. Dist.*, No. 14-CV-3845, 2016 WL 4939559, at *17 (S.D.N.Y. Sept. 14, 2016) (District had no obligation to defer to Dr. Damore's recommendation that EN attend a residential program for 2012-2013 school year); *P.K. ex rel. P.K. v. Bedford Cent. Sch. Dist.*, 569 F. Supp. 2d 371, 378, 387 (S.D.N.Y. 2008) (IEP recommending student's placement at therapeutic support program was appropriate even though not a residential placement, which Plaintiff's outside professionals had recommended); *see also G.W. v. Rye City Sch. Dist.*, No. 11-CV-8208, 2013 WL 1286154, at *19 (S.D.N.Y. Mar. 29, 2013) ("The court is not at liberty to favor [a privately hired expert's opinion] over the deference that should appropriately be accorded to the District in matters of educational policy."), *aff'd*, 554 Fed. App'x 56 (2d Cir. 2014) (summary order).  While here there were multiple private experts who recommended a residential placement for EN, the SRO's opinion that a therapeutic day program with before- and after-school supports provided a FAPE is "precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *A.C.*, 553 F.3d at 172.

The BOCES TSP, as described in in EN's IEPs, suggests that the District provided a FAPE.  (*See* D's Exs. 4-5.)[24]  Students in the TSP are provided with weekly individual and group counseling, (Tr. at 636:16-22), and TSP teachers and clinicians have experience addressing the needs of students with psychiatric disorders, (Tr. at 735:14-736:4).  EN's IEPs for the 2014-2015 and 2015-2016 school years also included BASIS as a support.  While Plaintiffs complain that they were only told BASIS would "help EN get out of the house in the morning," (Compl. ¶ 22), EN's IEPs state that the support would be available before and after school, (D's Ex. 2 at 11; D's Ex. 3 at 9; D's Ex. 4 at 2-3, 10; D's Ex. 5 at 9), and EN's mother's testimony confirms that she understood it involved homework assistance after school, (Tr. at 1653).  Moreover, EN's IEP provides that BASIS is supervised by a school psychologist, that all staff are certified teachers or teaching assistants, and that all staff are trained in therapeutic crisis intervention.  (D's Ex. 4 at 2-3.)  EN's IEP also specifies that the BASIS team

> goes to the home before school to establish routines to support getting up and ready for school.  The program staff model appropriate ways to interact with the child.  The BASIS program also provides after school support to set up a structured setting to assist with homework production and to help the parent[s] build skills to successfully interact with their child.

---

[24] EN's IEP notes:

> The Therapeutic Support Program provides small class settings (8:1:1) - for all core academics.  Teachers are dually certified in special education and the content area.  Students can be mainstreamed in music, sports, theater, [and] advanced art programs in the Irvington School.  Counseling Individual and Group is provided as part of the program.  The therapeutic environment is available throughout the day. . . .  Teachers are available to students 24/7 electronically for check-ins and supports.  There is also a motivational system in place, much like Grove School, to support compliance with academic performance.

(D's Ex. 4 at 2-3.)

(*Id.* at 2.)  Additionally, consistent with the requirement that students be educated in the LRE,

TSP students can take music, sports, theater, and advanced art programs with non-disabled

peers.[25]  *See* 20 U.S.C. § 1412(a)(5)(A) ("To the maximum extent appropriate, children with

disabilities . . . are [to be] educated with children who are not disabled, and special classes,

separate schooling, or other removal of children with disabilities from the regular educational

environment [is to] occur[] only when the nature or severity of the disability of a child is such

that education in regular classes with the use of supplementary aids and services cannot be

achieved satisfactorily."); *Walczak*, 142 F.3d at 132 ("While some children's disabilities may

indeed be so acute as to require that they be educated in residential facilities, it is appropriate to

proceed cautiously whenever considering such highly restrictive placements.  IDEA's preference

is for disabled children to be educated in the least restrictive environment capable of meeting

their needs."); *C.T. v. Croton-Harmon Union Free Sch. Dist.*, 812 F. Supp. 2d 420, 433

(S.D.N.Y. 2011) ("Courts in this district and the Second Circuit are reluctant to find that a

residential placement is required in the absence of clear evidence indicating that such a

placement is the child's only means of achieving academic progress.").

In light of the requirement that students be educated in the LRE, courts ordinarily require

"objective evidence of a child's regression in a day program before finding a residential

placement to be required by IDEA."  *Walczak*, 142 F.3d at 131; *see M.H.*, 296 F. App'x at 128

---

[25] Plaintiffs contend that the TSP is "similarly restrictive" to Grove in that the students in the TSP all have disabilities, but their argument that it is "not appropriate and potentially dangerous" for EN to be mainstreamed for music, sports, and the like makes it clear that the TSP is not, in fact, similarly restrictive.  (Ps' Reply at 21.)  I do not find the therapeutic day program to be "similarly restrictive" to Grove, not only because of the availability of mainstreaming, but because a residential placement is inherently more restrictive.  To the extent Plaintiffs are correct that aspects of the TSP are "similarly restrictive," however, such facts would seem to cut in favor of the TSP's appropriateness.

("In general, the Second Circuit requires that a court point to objective evidence of a child's regression in a day-program before finding that a residential placement is required by the IDEA."). EN never enrolled in the TSP/BASIS program, so the record contains no historical or other objective evidence that she would have regressed in that placement.

I also agree with Defendant that Plaintiffs' argument is "untenable in light of . . . prior determinations that placement in a therapeutic day program did not deprive EN of a FAPE." (D's Mem. at 15.) In 2016, Judge Karas of this Court found that EN's 2012-2013 IEP recommending the BOCES/BASIS program was substantively appropriate, *M.N.*, 2016 WL 4939559, at *18, and more recently, the Parents did not appeal the IHO's June 2017 decision finding the same placement to be appropriate for the 2013-2014 school year, (*see* SRO II at 5). The only relevant differences between those IEP determinations and the ones at issue in this case have to do with EN's documented improvements, (*see* D's Exs. 19, 20), and Dr. Dietrich's report, (D's Ex. 12). For the reasons already discussed, the report did not require the CSE to reconvene or revise EN's IEP. If it was appropriate for the CSE to recommend a therapeutic day program at its June 2014 meeting, notwithstanding the opinions of Dr. Damore, Ms. Darr, and Dr. Chilton – as was found to be the case by both the IHO and the SRO – then the recommended placement remained appropriate after the District received Dr. Dietrich's report. And the evidence that EN was making progress at Grove – while a tribute to her and that school, and a state of affairs that her parents would naturally want to continue – cuts against Plaintiffs' argument that a residential placement was required: if the recommendation of the TSP/BASIS day program was appropriate in June 2014, as the IHO and SRO found, that EN's condition had improved since then could only make a more restrictive placement less appropriate.

With respect to EN's IEP for the 2015-2016 school year, Plaintiffs argue that the District's suggestion that EN could sit for five Regents examinations during the summer of 2015 was "patently absurd," and demonstrates that the IEP was inappropriate.  (Ps' Reply at 16.) Defendants note that the CSE first inquired about Plaintiffs' interest in having EN sit for Regents examinations at the June 2014 CSE meeting, and then revisited the topic at the June 2015 CSE meeting.  (Doc. 28 at 5 n.1.)  Regardless of when or how many times the Regents examinations were discussed, providing EN an opportunity to take the Regents examinations – which would have allowed her to earn a Regents rather than a local diploma – does not constitute a violation of the IDEA.  The IEP did not require EN to sit for five Regents exams, but merely noted that the proposed program would support her if she and her parents so chose, and specifically left open whether she would achieve a local or Regents diploma.  (D's Ex. 5 at 2, 10; D's Ex. 6 at 1-2, 11.) And the fact that EN's parents were "flabbergasted" by the CSE's proposal does not mean that the SRO's decision was not "thorough and careful."  (Ps' Reply at 16.)

In fact, I find the SRO's decision – totaling twenty-three single spaced pages – to be quite thorough and careful.  And she conducted her own detailed review of the record for the 2015-2016 school year with little to no help from the IHO.[26]  (SRO II at 19-22.)  The SRO concluded that EN's IEP for the 2015-2016 school year – providing for an 8:1+1 special class placement in the TSP, individual and group counseling services, a transition plan,[27] and BASIS – was

---

[26] Upon remand, the IHO concluded that the District failed to offer EN a FAPE from November 1, 2014 through August 2015 but did not – as directed by the first SRO, (SRO I at 19) – separately examine the recommendations of the June 2014 and May/June 2015 CSEs.  (SRO II at 19; IHO II at 9, 22-23.)

[27] To help alleviate EN's parents' concerns about removing EN from Grove so close to completion of the program, the CSE noted that "[a] transition plan will be developed pending referral packets/placement/program acceptance."  (D's Ex. 5 at 2.)

appropriate.  (*Id.* at 22.)  The SRO explained that EN made "social/emotional, behavioral, and academic progress during the 2014-15 school year, such that a more restrictive placement recommendation for the 2015-16 school year was not warranted."  (*Id.*)  After examining the same documents that the CSE and SRO reviewed – which includes comprehensive service plans, report cards, a progress report, and Dr. Dietrich's report, (*id.* at 19 (citing Tr. at 126-27, 828-29; D's Ex. 5 at 3; Ps' Ex. J at 35-54; Ps' Ex. GG-II; D's Ex. 12.)) – and the 2015-2016 IEP noting what was discussed at the May 2015 and June 2015 CSE meetings, (D's Ex. 5 at 1-2; D's Ex. 6 at 1-3), I join the CSE, SRO, Ms. Lynch, and Dr. Dietrich in concluding that EN made significant progress during the 2014-2015 school year.[28]

While Dr. Dietrich and other private experts believed EN still required a residential placement, the CSE – including the District's school psychologist – disagreed.  (*Compare* D's Ex. 12, *with* D's Exs. 2-6; Tr. at 520, 539-40.)  That psychologist, who reviewed Dr. Dietrich's report before the May 2015 CSE meeting, testified that she believed Dr. Dietrich's residential placement recommendation was "overly restrictive" and that while she did not think that EN had required a residential placement initially, she "certainly" did not think one was appropriate as EN "got older and matured and improved."  (Tr. at 520, 523, 605:11-21.)  As discussed, the fact that privately hired experts recommended different programing does not change the deference I owe to the district, its trained educators, and the SRO.  See *E.S.*, 742 F. Supp. 2d at 436 ("The mere fact that a separately hired expert has recommended different programming does nothing to change the

---

[28] The SRO explained that a report from Grove "reflected that [EN] had met objectives related to improving her self-awareness and self-concept and had either met or was making progress toward objectives to develop healthy distress tolerance skills, learn effective interpersonal skills and demonstrate the ability to engage in healthy appropriate relationships, and prepare for post-secondary living and education."  (SRO II at 19-20 (citing Ps' Ex. J at 44-46).)  And at the May 2015 CSE meeting, Ms. Lynch and Dr. Dietrich noted that EN had made a lot of progress.  (D's Ex. 5 at 1-2.)

deference [owed] to the district and its trained educators.") (internal quotation marks and

alterations omitted); *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 383 (2d Cir. 2003)

(reversing a district court that "impermissibly chose between the views of conflicting experts on a

controversial issue of educational policy . . . in direct contradiction of the opinions of state

administrative officers who had heard the same evidence").

      In sum, I find that the SRO reasonably concluded that the CSE's recommended

placement in the BOCES/BASIS program was appropriate for EN during the 2014-2015 and

2015-2016 school years.  EN's IEPs made it likely that the proposed program would yield

appropriate progress in light of EN's circumstances, which satisfies the District's obligations

under the IDEA.  *See Endrew F.*, 137 S. Ct. at 999.  According due weight to the SRO's reasoned

conclusion regarding the placement proposed by the District, I agree that the 2014-2015 and

2015-2016 IEPs provided EN with a FAPE.  *See P.C.*, 232 F. Supp. 3d at 410.

### D.    Improper Burden Shifting and Retrospective Testimony

      Plaintiffs argue that the SRO impermissibly placed the burden on the Parents to show that

the District's proposal was not appropriate, as opposed to the District showing that its placement

was appropriate.  (Ps' Mem. at 13.)  Plaintiffs also assert that social worker Phang's testimony

constituted "impermissible retrospective testimony unlawfully ordered by the SRO."  (*Id.* at 14.)[29]

I agree with Defendants that neither of these arguments has merit.

---

[29] Plaintiffs also assert that Ms. Phang was "thoroughly uninformed and had no personal
knowledge about EN and her family," (Ps' Reply at 18), but this contention is not relevant, as
Ms. Phang's testimony was about the services provided by the BASIS program, and she did not
purport to opine on EN's individual situation.

### 1. Burden Shifting

The first SRO decided to remand because – having rejected the IHO's reliance on the purported procedural defect of not reconvening the CSE – he found gaps in the record regarding whether Dr. Dietrich's safety concerns differed from those already before the June 2014 CSE and whether the BASIS program would suffice to address them.  (SRO I at 18.)  In so doing, he noted that Dr. Dietrich "seemed unaware or did not discuss aspects of the district's proposed BOCES TSP with BASIS placement."  (*Id.*)  On remand, the IHO found that the above-described comments of the SRO impermissibly shifted the burden to EN's Parents and Dr. Dietrich to show why the TSP with BASIS would not provide a FAPE.  (IHO II at 13.)  That is simply not a fair characterization of the first SRO's decision, which merely sought to determine if Dr. Dietrich had factored the BASIS supports into her opinion that safety concerns mandated a residential placement.  I agree with the second SRO that "the expectation that a witness articulate a foundation for an opinion does not constitute a shifting of the burden of proof."  (SRO II at 18 n.13.)  The SRO did not shift the evidentiary burden, but instead sought to develop a more comprehensive factual record before determining whether the BOCES TSP with BASIS was an appropriate placement for EN.  (*See* SRO I at 18.)  In any event, even if the first SRO had applied an incorrect legal standard, there is no allegation that the second SRO, whose decision is under review here, did the same.

### 2. Retrospective Testimony

In the Second Circuit, an IEP "must be evaluated prospectively as of the time of its drafting and therefore . . . retrospective testimony that the school district would have provided additional services beyond those listed in the IEP may not be considered."  *R.E.*, 694 F.3d at 186.  The prohibition against retrospective testimony is intended to reflect the fact that "[a]t the time

the parents . . . choose whether to accept the school district recommendation or to place the child

elsewhere, they have only the IEP to rely on." *Id.* "In determining the adequacy of an IEP, both

parties are limited to discussing the placement and services specified in the written plan and . . .

reasonably known to the parties at the time of the placement decision." *Id.* at 187; *see K.L. ex

*rel. M.L. v. N.Y.C. Dep't of Educ.*, 530 Fed. App'x 81, 85 (2d Cir. 2013) (summary order)

("Restrictions on the use of retrospective evidence are rooted in the principle that parents must

be able to decide rationally whether to accept a proffered public school placement or to send

their child, at the risk of non-reimbursement, to private school.  In most cases, parents make this

difficult decision on the basis of the IEP.  Accordingly . . . the SRO must assess the IEP from this

*ex ante* perspective.").  Thus, because "a deficient IEP may not be effectively rehabilitated or

amended after the fact through testimony regarding services that do not appear in the IEP," *R.E.*,

694 F.3d at 185, "testimony that materially alters the written plan is not permitted," *id.* at 186.

But the Second Circuit has rejected a "rigid 'four corners' rule prohibiting testimony that goes

beyond the face of the IEP," and permits testimony "that explains or justifies the services listed

in the IEP." *Id.* at 186.

> [I]f an IEP states that a specific teaching method will be used to instruct a student, the
> school district may introduce testimony at the subsequent hearing to describe that
> teaching method and explain why it was appropriate for the student.  The district,
> however, may not introduce testimony that a different teaching method, not mentioned in
> the IEP, would have been used.  Similarly, if a student is offered a staffing ratio of 6:1:1,
> a school district may introduce evidence explaining how this structure operates and why
> it is appropriate.  It may not introduce evidence that modifies this staffing ratio (such as
> testimony from a teacher that he would have provided extensive 1:1 instruction to the
> student).

*Id.* at 186-87.

Plaintiffs quote the portion of the IHO's decision discussing Ms. Phang's testimony in

attempt to advance their argument that Ms. Phang testified to "matters and things that were not

remotely discussed at the CSE Meetings." (Ps' Mem. at 13-14.) Plaintiffs then recite the SRO's

analysis as to why this testimony was permissible, characterizing it as "misplaced." (*Id.* at 14-

15.) But as Plaintiffs point out, the SRO explicitly stated that "'to the extent [Ms. Phang's]

testimony went beyond the bounds of explaining BASIS as listed in the IEP, it has not been

relied upon.'" (*Id.* at 15 (quoting SRO II at 17).) This ruling showed a nuanced understanding

of the Second Circuit's jurisprudence prohibiting post-hoc rewriting of the IEP but permitting

explanatory testimony about the services described therein, and adhered to the admonition that

"the appropriate inquiry is into the nature of the program actually offered in the written plan."

*R.E.*, 694 F.3d at 185-87.

Ms. Phang testified, among other things, that the BASIS program could be available as

early as needed to get a student to school, and until approximately 9:00 p.m. and on weekends.

(Tr. at 1561-62, 1575, 1591, 1600-01.) Such testimony is permissible because EN's IEPs

explicitly stated that she would receive daily BASIS services both before and after school. (D's

Ex. 2 at 11; D's Ex. 3 at 9; D's Ex. 4 at 2-3, 10; D's Ex. 5 at 9.)[30] The added details regarding

the exact hours BASIS providers are available did not go beyond what was provided for in EN's

IEP.[31] *See P.C.*, 232 F. Supp. 3d at 416 (a few additional details about CSE's recommendations

did not materially alter written plan or prevent parents from making informed decision).

Additionally, Ms. Phang's testimony regarding BASIS providers and the strategies they

employed merely explains or justifies the BASIS program. *See R.E.*, 694 F.3d at 186-87; *see*

---

[30] EN's June 2014 IEP notes that "[t]he team goes to the home before school to establish routines to support getting up and ready for school" and "[t]he BASIS program also provides after school support to set up a structured setting to assist with homework production and to help the parent build skills to successfully interact with their child." (D's Ex. 4 at 2.)

[31] The District never suggested that BASIS provided 24/7 coverage, which Plaintiffs plainly understood all along. (*See* Tr. at 1652:15-1653:23.)

*also F.L. ex rel. F.L. v. N.Y.C. Dep't of Educ.*, 553 Fed. App'x 2, 6 (2d Cir. 2014) (summary

order) (related services testimony not retrospective where it did not "contradict anything told to

the parents before the placement decision"). For example, Ms. Phang testified that BASIS

providers include psychologists, social workers, and school counselors "who all can provide

clinical counseling," (Tr. 1563:4-6), which is consistent with the statement in EN's 2014-2015

IEP that "the program is supervised by a school psychologist, all staff are certified teachers or

teaching assistants, all have training in therapeutic crisis intervention," (D's Ex. 4 at 3).

When asked about strategies that have been used with school avoidant students, Ms.

Phang described a "multi-layer intervention," which includes use of behavioral strategies. (Tr. at

1564:10-20.) She explained "that's really looking at a rewards-based system as well as looking

at the consequences that the parents provide when a child refuses to go to school." (*Id.*) Ms.

Phang then emphasized that BASIS is "a family system process" whereby providers "come up

with a strategy together with the parents." (Tr. at 1565:16-21.) I find this testimony permissible

because EN's IEP provides for a Behavior Intervention Plan, notes that BASIS staff model

appropriate ways for parents to interact with their child, and specifies that the BASIS program

"works directly with families to support with school avoidance and homework." (D's Ex. 4 at 1-

2.) And even if Ms. Phang exceeded her bounds by discussing some topics that were not

discussed at a CSE meeting or written in EN's IEP, her testimony is not dispositive on the issue

of whether the District-recommended placement offered EN a FAPE. *See K.L.*, 530 Fed. App'x

at 85 ("The question . . . is not whether the SRO relied on impermissible retrospective evidence,

but whether sufficient *permissible* evidence, relied on by the SRO, supports the SRO's

conclusion that the IEP offered [the student] a reasonable prospect of educational benefits.")

(emphasis in original).

The SRO ultimately found that the District sustained its burden of demonstrating that the placement set forth in EN's IEP provided a FAPE.  Based on my review, the record amply supports that decision, which is a matter requiring educational expertise.  *See M.H.*, 685 F.3d at 244.  Accordingly, I must not substitute my "own notions of sound educational policy" for those of the school authorities.  *Rowley*, 458 U.S. at 206.

Because I find that the BOCES TSP, along with the BASIS program, was an appropriate recommendation for the 2014-2015 and the 2015-2016 school years, I need not address whether EN's unilateral placement at Grove was appropriate or whether equitable considerations would warrant reimbursement.  My review of the record, with due deference to the SRO's findings, shows that the District fulfilled its responsibility.

*     *     *

I recognize and understand Plaintiffs' desire to obtain the best possible education for EN, their dissatisfaction with the outcome of the placement process, and the challenges they faced in parenting EN during a difficult and painful period in her life.  But the law does not require the District to place EN in the best possible environment or the one most conducive to the family's tranquility; it merely requires the District to make a recommendation that is reasonably calculated to enable EN to make progress appropriate in light of her circumstances, and to do so in the least restrictive environment.  *See Endrew F.*, 137 S. Ct. at 999.  The issue is not whether Grove could meet EN's or her family's needs better than the BOCES TSP, complemented by the BASIS program.  Rather, it is whether there are adequate grounds for me to overrule the SRO's judgment that the District's IEPs recommending the latter programs offered EN a FAPE.  I find that there are not.

## Conclusion

Because the SRO appropriately found that the District offered EN a FAPE, Plaintiffs'

motion for summary judgment is denied and Defendant's motion for summary judgment is

granted.  The Clerk of Court is respectfully directed to terminate the pending motions, (Docs. 20,

26), enter judgment for Defendant, and close the case.

**SO ORDERED.**

Dated:  December 21, 2020
       White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.